IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANA-BÖRGER GRECO | : | |
| Administratrix of the Estate of | : | |
| JOSE GRECO, Deceased | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 02-CV-6862 |
| | : | |
| THE NATIONAL RAILROAD | : | |
| PASSENGER CORPORATION | : | |
| (AMTRAK), ET AL. | : | |

SURRICK, J.                                                                 JUNE 1, 2005

**MEMORANDUM & ORDER**

Presently before the Court is Defendants The National Railroad Passenger Corporation

("Amtrak"), Amtrak Police Officer Richard P. Drury ("Drury"), Amtrak Police Officer Kevin

Molloy ("Molloy"), and Amtrak Conductor Alex Baldwin's ("Baldwin") Motion For Summary

Judgment (Doc. No. 24), Defendants Amtrak, Drury, Molloy, and Baldwin's Motion In Limine

(Doc. No. 27), and Plaintiff Ana Börger-Greco's ("Börger-Greco") Motion In Limine To

Preclude Evidence That Jose Greco Had Consumed Alcohol, Smelled Of Alcohol And Possessed

An Unopened Bottle Of Beer At The Time Of His Arrest (Doc. No. 28).  For the following

reasons, Defendants' Motions will be granted in part and denied in part and Plaintiff's Motion

will be granted in part and denied in part.

I.      **BACKGROUND**

On September 18, 2000, eighty-one-year-old Jose Greco ("Greco") boarded Amtrak train

number 649 at Pennsylvania Station in New York City.  (Doc. No. 26 Exs. 8, 38; Börger-Greco

1

Dep. at 53.)[1]  Soon after the Amtrak train left the station, a woman wearing an orange Amtrak t-shirt came down the aisle toward Greco looking for a seat.  (Schultz Dep. at 14-15; Wigod Dep. at 15.)[2]  At that point, Greco was lying across two seats.  (Schultz Dep. at 11; Wigod Dep. at 15.)  The woman asked Greco to sit up so that she could use one of the seats.  (Schultz Dep. at 16; Wigod Dep. at 15.)  Greco refused, indicated that he was not feeling well, and told her to find another seat.  (Wigod Dep. at 15; Doc. No. 26 Ex. 11.)

The female passenger told Aliza Camps-Mathis ("Camps-Mathis"), an Amtrak assistant conductor,[3] that Greco had refused to move.  (Camps-Mathis Dep. at 9, 39, 111.)  Camps-Mathis then approached Greco, who did not appear to be ill, and asked him several times to sit up because another passenger wanted to use the second seat.  (*Id.* at 9, 113, 119, 126.)  Greco refused to move.  (*Id.*)  Camps-Mathis did not ask Greco if he was sick and Greco did not tell Camps-Mathis that he was sick.  (*Id.* at 118, 128.)  Camps-Mathis told Baldwin, the Amtrak conductor, that Greco was continuing to occupy two seats.  (Baldwin Dep. at 8, 62; Camps-Mathis Dep. at 128.)

When Baldwin spoke to Greco, he was still lying across two seats.  (Baldwin Dep. at 66; Schultz Dep. at 23.)  Baldwin asked Greco several times to relinquish the second seat (Camps-Mathis Dep. at 9-10, 130; Schultz Dep. at 24; Wigod Dep. at 15), but Greco refused.  (Baldwin Dep. at 68; Camps-Mathis Dep. at 9-10, 130; Schultz Dep. at 24; Wigod Dep. at 15.)  Neither

---

[1]Ana Börger-Greco is the Administratix of the Estate of Greco.  (First Am. Compl. ¶ 1.)

[2]Bruce Wigod ("Wigod") and Fred Schultz ("Schultz") were passengers in the same train car as Greco.  (Schultz Dep. at 11; Wigod Dep. at 10.)

[3]Trainmen is another term for assistant conductor.  (Camps-Mathis Dep. at 164.)

Baldwin nor Camps-Mathis asked Greco whether he was sick or needed medical attention. (Baldwin Dep. at 70; Camps-Mathis Dep. at 134; Wigod Dep. at 17.)  However, Greco, who testified to this, told Baldwin that he was not feeling well.[4]  (Doc. No. 26 Ex. 11.)  Greco spoke to Baldwin in an aggravated and argumentative tone of voice, although his behavior was not unruly.  (Baldwin Dep. at 68; Schultz Dep. at 29; Wigod Dep. at 17.)  When Greco refused to sit up, Baldwin told him that he would be removed from the train by the Amtrak police if he did not move.  (Baldwin Dep. at 73; Camps-Mathis Dep. at 10, 130-31; Schultz Dep. at 26; Wigod Dep. at 17.)  During Greco's exchange with Baldwin, Greco asked Baldwin why he was "f---ing with him" and told Baldwin to leave him alone (Baldwin Dep. at 71), to call the police (Camps-Mathis Dep. at 134), and to throw him off of the train at the next stop.  (Wigod Dep. at 17.)

After unsuccessfully attempting to get Greco to sit up, Baldwin requested that Amtrak Police assistance be provided at the next train station.  (Baldwin Dep. at 73; 2/24/04 Drury Dep. at 118-19.)  When Officers Drury and Molloy received the message from Amtrak's Philadelphia radio desk, they met the train at the Trenton train station.  (2/24/04 Drury Dep. at 118-19.) Before entering the train, Drury and Molloy spoke to Baldwin about Greco on the platform of the train station.  (*Id.* at 120; Molloy Dep. at 65.)  Drury testified that Baldwin told the officers that Greco was using two seats, refused to relinquish the second seat, used abusive language toward the woman who wanted his seat, and used profane language toward him.[5]  (2/24/04 Drury Dep. at

---

[4]Wigod did not hear Greco tell Baldwin that he was ill.  (Wigod Dep. at 31.)

[5]There are differing accounts regarding whether Greco was intoxicated.  In the Incident Report for Greco's arrest, Drury noted that the arrest was alcohol-related and that Greco's speech was slurred.  (Doc. No. 26 Ex. 39.)  He also wrote that he "noticed a strong smell of an alcoholic beverage coming from Mr. Greco" (*id.*) and testified that Baldwin told him that Greco appeared to be intoxicated.  (2/24/04 Drury Dep. at 117.)  However, Baldwin, Champs-Mathis, Schultz,

117, 133-34.)  The officers then entered the train with Baldwin.

After Baldwin pointed out Greco to the officers, saying "there's the son of a bitch," they approached him.  (Baldwin Dep. at 80; 2/24/04 Drury Dep. at 123; Doc. No. 26 Ex. 11.)  While Drury observed, Molloy asked Greco, who was still lying across two seats, to sit up so that another passenger could use the second seat.[6]  (Baldwin Dep. at. 81; Camps-Mathis Dep. at 10; 2/24/04 Drury Dep. at 123.)  Greco then became upset and argumentative, told Drury and Molloy "to get the f--- off the train" and to "leave me the f--- alone," and continued to lay across two seats.  (Baldwin Dep. at 81-82; 2/24/04 Drury Dep. at 124-25; Molloy Dep. at 71.)  Molloy told Greco several times that he would be arrested if he did not move.  (2/24/04 Drury Dep. at 130; Molloy Dep. at 79.)  Even though Greco did not appear sick and did not tell Molloy that he was ill (Molloy Dep. at 75), Molloy asked Greco if he wanted an ambulance.  (2/24/04 Drury Dep. at 125; Molloy Dep. at 73.)  Greco refused the offer of an ambulance.  (Molloy Dep. at 79.)

Drury decided to arrest Greco based on his assessment that Greco's statements and conduct were threatening.  (2/24/04 Drury Dep. at 131, 135; 7/30/04 Drury Dep. at 189; *see also* 2/24/04 Drury Dep. at 130 ("Mr. Greco became louder and louder and more profane, he got highly agitated, aggravated, he what I consider started to use threatening behavior at that time . . . ."); Molloy Dep. at 45.)  After Drury informed Greco that he was being placed under arrest, he continued to lay across the two seats.  (Molloy Dep. at 81.)  Greco continued to be loud and

---

and Wigod testified that Greco's appearance and behavior did not suggest that he had been drinking or that he was intoxicated.  (Baldwin Dep. at 88; Champs-Mathis Dep. at 120; Schultz Dep. at 20, 27; Wigod Dep. at 17, 31.)  Molloy testified that Greco's eyes were bloodshot. (Molloy Dep. at 72.)

[6]Greco asserts that he was immediately grabbed by Drury and Molloy.  (Doc. No. 26 Ex. 11.)

profane after Drury told him that he was being placed under arrest.[7]  (2/24/04 Drury Dep. at 137.)

In order to get Greco to stand up, Drury grabbed him and removed him from the seats.  (2/24/04

Drury Dep. at 137-38; Molloy Dep. at 83.)  Drury handcuffed Greco while they were still on the

train and began to escort him from the car, with Drury's left hand on Greco's shoulder or arm.

(2/24/04 Drury Dep. at 138; 7/30/04 Drury Dep. at 200, 202.)  Molloy walked down the aisle of

the train car behind Drury and Greco.  (Molloy Dep. at 85-86.)  At some point, however, Molloy

also held Greco as he was being escorted from the train.  (Baldwin Dep. at 82, 86.)  Molloy

testified that, as he was being taken down the aisle of the train, Greco "was screaming at the top

of his lungs, 'I'm an old man, what are you doing, leave me alone.'"  (Molloy Dep. at 85-86.)

Greco struggled and resisted the officers as they left the train.  (Baldwin Dep. at 86; Molloy Dep.

at 86.)

As Greco was escorted from the train, he was injured.  The parties dispute how he

sustained his injuries.  Drury testified that Greco fell onto the train platform when he "placed his

foot in between my foot and we stumbled" (2/24/04 Drury Dep. at 138), but that he broke

Greco's fall.[8]  (*Id.* at 197.)  According to Greco, he "was dragged from the train and dumped on

the platform" (Doc. No. 26 Ex. 11) or "thrown to the ground."  (*Id.* Ex. 5.)  Greco suffered a

laceration on his forehead as a result of the fall.  (2/24/04 Drury Dep. at 138.)  He did not tell the

---

[7]Prior to effecting the arrest, Drury did not ask Greco if he had any medical condition. (2/24/04 Drury Dep. at 135.)

[8]Molloy did not see this incident occur because he was still in the aisle of the train. (Molloy Dep. at 92.)  When he turned the corner to exit the train, Drury was on top of Greco, "as if they just fell."  (*Id.*)  Molloy further explained that Drury "fell on top of" Greco.  (*Id.*)

officers that he sustained any other injuries.[9]  (*Id.* at 139.)

Drury and Molloy then took Greco to the Amtrak police processing area of the Trenton train station.  (*Id.* at 140; Molloy Dep. at 93.)  Once at the processing center, Molloy gave Greco a tissue and water for the cut on his forehead.  (Molloy Dep. at 93.)  Pursuant to a search of Greco incident to his arrest, the officers found, among other items, an unopened beer.  (*Id.*)  Drury then removed one of Greco's handcuffs, chained him to a detention bar, processed his arrest, gave him a summons, and released him.  (2/24/04 Drury Dep. at 140-41; 7/30/04 Drury Dep. at 197, 203.)  The summons that Drury issued charged Greco with disorderly conduct.  (Doc. No. 26 Ex. 38.)  After his arrest, Greco took another Amtrak train to Lancaster, Pennsylvania, where he resided.  (Börger-Greco Dep. at 61.)

On September 19, 2000, Robert G. Shultz, M.D., Greco's family physician, examined Greco's injuries and made arrangements for x-rays to be taken of Greco's right foot.  (*Id.* at 97.)  These x-rays indicated a dorsal dislocation of the fourth MTP joint.[10]  (Doc. No. 26 Ex. 5.)  Dr. J. Paul Lyet, M.D., examined Greco on September 21, 2000, and concluded that his hip had mild traumatic bursitis.  (*Id.*)  The toes of his right foot were well aligned, although he had "tenderness at the fourth MTP joint with some malrotation to the fourth digit."  (*Id.*)  Dr. Lyet unsuccessfully attempted a closed reduction of the fourth MTP toe dislocation with local anesthetic.  (*Id.*)

On September 21, 2000, Greco also underwent a realignment procedure for the dislocated toe, which involved placing a pin in the toe to stabilize it.  The operation "included an open

---

[9]The parties disagree about whether Greco complained that the handcuffs caused him pain.  (*Compare* 7/30/04 Drury Dep. at 203, *with* Doc. No. 26 Ex. 11.)

[10]Greco had also dislocated this toe prior to September 18, 2000.  (Börger-Greco Dep. at 99.)

reduction internal fixation with modified Keller shortening osteotomy with pinning." (*Id.* Ex. 8.)
During the operation, Dr. Lyet diagnosed Greco's toe injury as being "an acute injury on a
chronic dislocation." (*Id.* Ex. 6.)

On October 3, 2001, after the partial phalangectomy and reduction of the fourth MTP
dislocation procedure, Raymond E. Peart, M.D., examined Greco and noted that he was "doing
well, with minimal discomfort." (*Id.*) He noticed that the "incision is slightly erythematous.
There is a slight crusty exudate both at the tip of the toe adjacent to the pin, as well as around the
incision." (*Id.*) On October 12, 2000, the toe continued to be well pinned and there were no
signs of infection. (*Id.* Exs. 6, 8.) Carl E. Becker II, M.D., examined Greco on October 18,
2000, and noted increased redness and swelling about the pin site. (*Id.*) During an October 24,
2000, examination, Dr. Lyet was concerned about the pin being a nidus of infection. (*Id.* Exs. 5,
8.)

On November 13, 2000, Greco went to the Emergency Room of the Lancaster Regional
Medical Center and was admitted to the hospital because he had significant pain. (*Id.* Exs. 7, 8.)
Robert G. Shultz, M.D., concluded that Greco had "Staphylococcal sepsis, Staph aureus with
probably multiple emboli, spleen to bones." (*Id.* Ex. 7.) After being hospitalized for
approximately six (6) weeks, Greco returned to his residence and had periodic medical
appointments at the Heart Group. (Börger-Greco Dep. at 108-09.) Greco died on December 31,
2000, at the age of eighty-one (81). (Doc. No. 26 Ex. 8.) After conducting an autopsy, Wayne
K. Ross, M.D., concluded "that the cause of death is Complications of Endocarditis due to
Traumatic Foot Injury.  The manner of death is *Homicide*." (*Id.*)

Plaintiff's Amended Complaint (Doc. No. 7) alleges ten counts against Defendants:  (1)

violations of 42 U.S.C. § 1983; (2) false arrest; (3) false imprisonment; (4) malicious

prosecution; (5) assault and battery; (6) civil conspiracy; (7) breach of contract; (8) wrongful

death; (9) survival action; and (10) loss of consortium.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).[11]  A genuine issue of material fact exists only when "the

evidence is such that a reasonable jury could return a verdict for the non-moving party."

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of demonstrating that

there are no facts supporting the non-moving party's legal position. *Celotex Corp. v. Catrett,* 477

U.S. 317, 322-24 (1986).  Once the moving party carries this initial burden, the nonmoving party

must set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e);

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (explaining that the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts").  "The nonmoving party . . . 'cannot rely merely upon bare assertions,

conclusory allegations or suspicions' to support its claim." *Townes v. City of Philadelphia*, Civ.

---

[11]Much of the evidence proffered by Defendants in support of their Rule 56 Motion is unrefuted by Plaintiff, and cannot be contested by Plaintiff at trial because Greco is deceased. Thus, the instant Motion could, for certain claims, be viewed as one arising under Federal Rule of Civil Procedure 50.  However, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250-51 (1986)).

A. No. 00-CV-138, 2001 U.S. Dist. LEXIS 6056, at *4 (E.D. Pa. May 11, 2001) (quoting

*Fireman's Ins. Co. v. DeFresne*, 676 F.2d 965, 969 (3d Cir. 1982)).  Rather, the party opposing

summary judgment must go beyond the pleadings and present evidence through affidavits,

depositions, or admissions on file to show that there is a genuine issue for trial.  *Celotex*, 477

U.S. at 324.  When deciding a motion for summary judgment, the court must view facts and

inferences in the light most favorable to the nonmoving party.  *Anderson,* 477 U.S. at 255; *Siegel*

*Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).  We will not resolve

factual disputes or make credibility determinations.  *Siegel Transfer, Inc.*, 54 F.3d at 1127.

## III.   EVIDENTIARY ISSUES

### A.   Admissibility of Greco's Written Statement Under Federal Rule of Evidence 807

Prior to his death, Greco sought to recount his September 18, 2000, arrest, as well as its

effects on him, in a written statement which he began to prepare at the prompting of an

attorney.[12]  Defendant seeks to exclude this statement as inadmissible hearsay.  (Doc. No. 27 at

12-13.)  While Plaintiff concedes that the statement constitutes hearsay (Doc. Nos. 26 at n.2, 30

at 27), she argues that it is admissible under Federal Rule of Evidence 807.  (Doc. No. 30 at 37-

40.)  In reviewing a motion for summary judgment, a court may not consider a hearsay statement

that would be inadmissible at trial.  *Blackburn v. United Parcel Serv.*, 179 F.3d 81, 95 (3d Cir.

---

[12]Plaintiff relies on the following portions of Greco's written statement to oppose
Defendants' Motion for Summary Judgment:  (1) Greco's recollection of his interaction with
Baldwin, during which he told Baldwin that he was sick and Baldwin told Greco to relinquish the
second seat (Doc. No. 26 at 27, 38-40 (citing Börger-Greco Dep. at 84)); (2) Greco's recollection
of the arrest by Drury and Molloy (*id.* at 29, 36, 41-44, 47-50 (citing Börger-Greco Dep. at 85));
and (3) Greco's recollection of Drury and Molloy's treatment of him after they took him into
custody (*id.* at 36-37 (citing Börger-Greco Dep. at 85-86)).

1999) (citing *Philbin v. Trans Union Corp.*, 101 F.3d 957, 961 n.1 (3d Cir. 1996)).  Thus, we

must consider whether the written statement is admissible under the Federal Rules of Evidence.

Rule 807 provides that:

A statement not specifically covered by Rule 803[13] or 804[14] but having equivalent
circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if
the court determines that (A) the statement is offered as evidence of a material
fact; (B) the statement is more probative on the point for which it is offered than
any other evidence which the proponent can procure through reasonable efforts;
and (C) the general purposes of these rules and the interests of justice will best be
served by admission of the statement into evidence.  However, a statement may not
be admitted under this exception unless the proponent of it makes known to the
adverse party sufficiently in advance of the trial or hearing to provide the adverse
party with a fair opportunity to prepare to meet it, the proponent's intention to offer
the statement and the particulars of it, including the name and address of the
declarant.

Fed. R. Evid. 807.[15]  In order to be admissible under this exception, a hearsay statement must:

(1) have sufficient guarantees of trustworthiness; (2) be evidence of a material fact; (3) have

sufficient probative value; (4) serve the interests of justice; and (5) provide sufficient notice to

the adverse party.  *See Coyle v. Kristjan Palusalu Maritime Co., Ltd.*, 83 F. Supp. 2d 535, 545

(E.D. Pa. 2000), *aff'd*, 254 F.3d 1077 (3d Cir. 2001) (table).  This residual exception is to be

---

[13]Federal Rule of Evidence 803 details several categories of evidence which are not
excluded by the hearsay rule, even though the declarant is available as a witness.  Fed. R. Evid.
803.

[14]Federal Rule of Evidence 804 details several categories of evidence which are not
excluded by the hearsay rule when the declarant is unavailable as a witness.  Fed. R. Evid. 804.

[15]Before the adoption of Rule 807 in 1997, the residual hearsay exceptions in the Federal
Rules of Evidence were contained in Rule 803(24) and Rule 804(b)(5).  Rule 807, which is a
combination of these two rules, was created "to facilitate additions to Rules 803 and 804.  No
change in meaning [was] intended."  Fed. R. Evid. 807 advisory committee's note.  Thus, cases
that apply the residual hearsay exceptions previously found in Rules 803 and 804 apply with
equal force to Rule 807.  *Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 112
n.17 (3d Cir. 2001).

"used very rarely, and only in exceptional circumstances."  Fed. R. Evid. 803 advisory

committee's note; *see also Trs. of Univ. of Pa. v. Lexington Ins. Co.*, 815 F.2d 890, 906 (3d Cir.

1987); *United States v. Bailey*, 581 F.2d 341, 347 (3d Cir. 1978); *Russo v. Abington Mem'l Hosp.*

*Healthcare Plan*, Civ. A. No. 94-195, 1998 U.S. Dist. LEXIS 18595, at *9 (E.D. Pa. Nov. 16,

1998) ("A catch-all rule such as Rule 807 must be sparingly invoked, lest its potential breadth

swallow the carefully crafted narrowness of the enumerated exceptions.").

       1.      Sufficient guarantees of trustworthiness

In reviewing whether the proffered hearsay statement has sufficient guarantees of

trustworthiness, a court must balance the following factors:  (1) whether the declarant was under

oath when the statement was made; (2) whether the declarant voluntarily made the statement; (3)

whether the statement was based on the declarant's personal knowledge; (4) whether the

statement contradicted a prior statement; (5) whether the statement was videotaped in order to

provide the jury with an opportunity to evaluate the declarant's demeanor;[16] (6) the ability of an

adverse party to cross-examine the declarant; (7) the proximity in time between the statement and

the events described; (8) whether the statement is corroborated; (9) the declarant's motivation to

fabricate the contents of the statement; (10) whether the statement was prepared in anticipation of

litigation; (11) the statement's spontaneity; and (12) whether the declarant's memory or

perception was faulty.[17]  *See Bohler-Uddeholm Am., Inc. v. Ellwood Group*, 247 F.3d 79, 112-13

_____

[16]Greco's statement was written, not oral.

[17]In determining whether a statement is admissible under the residual hearsay exception, a review of the statement's reliability is especially important because it does "not share the same tradition of reliability that supports the admissibility of statements [that are admitted] under a firmly rooted hearsay exception."  *Idaho v. Wright*, 497 U.S. 805, 817 (1990).

(3d Cir. 2001); *Brown v. Philip Morris, Inc.*, 228 F. Supp. 2d 506, 512 (D.N.J. 2002) (excluding

decedent's videotaped statement) (citing *Sternhagen v. Dow Co.*, 108 F. Supp. 2d 1113, 1120 (D.

Mont. 1999)).  A court should consider these factors given the totality of the circumstances "that

surround the making of the statement and that render the declarant particularly worthy of belief."

*Idaho v. Wright*, 497 U.S. 805, 819 (1990).

After balancing these factors, we conclude that Greco's statement is not admissible under

the residual exception to the hearsay rule.  Greco voluntarily made the statement, which was

based on his personal knowledge of what occurred when he was arrested on September 18, 2000,

and it does not contradict any prior statements.[18]  While these factors militate in favor of

admission of the statement, they are far outweighed by those considerations which compel its

preclusion.  Defendants were not given the opportunity to cross-examine Greco regarding the

contents of his written statement.  We recognize that the inability to cross-examine the declarant

does not automatically preclude the statement's admission.  *See Wright*, 497 U.S. at 820 ("[I]f the

declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-

examination would be of marginal utility, then the hearsay rule does not bar admission of the

statement at trial.").  However, a court should not admit a hearsay statement that was not subject

to cross-examination unless it is "so trustworthy that adversarial testing would add little to its

reliability."  *Id.* at 821.

Here, the totality of the circumstances that surround the making of the statement suggest

that the opportunity to cross-examine Greco would have added significantly to the statement's

evidentiary value.  Greco did not begin to write the statement until more than two weeks after his

---

[18]We do not know whether Greco made the statement in anticipation of litigation.

altercation with the Amtrak police.  (Börger-Greco Dep. Ex. Greco-1 ("This is what?  The 16th[,] 18th[,] 20th day after that sad experience."); Börger-Greco Dep. at 81; Doc. No. 26 Ex. 8.)  More than a month after the arrest, Greco made three more entries to the statement at the suggestion of his psychologist, Bruce Wittmaier, Ph.D.  (Börger-Greco Dep. at 88-89, 92-94.)  On October 28, 2000, Greco made a final entry detailing the effects of the arrest on him.  (Börger-Greco Dep. Ex. Greco-1.)  None of these entries were made either spontaneously or in close proximity in time to the events described, which increases the probability Greco's memory was not as keen as it was immediately after his arrest.[19]

Furthermore, the circumstances surrounding this statement are suspect.  Greco began to create his written statement at the prompting of the attorney for his estate.  After talking to his attorney, Greco certainly had a motive to paint an unfavorable portrait of Amtrak and its agents.[20] (Börger-Greco Dep. at 81.)  For instance, Greco concluded that Drury and Molloy both pulled him from his seat.  (*Id.* at 85.)  However, Drury and Molloy, each of whom testified under oath, agree that Drury removed Greco from his seat.  (Drury Dep. at 137-38; Molloy Dep. at 83.)  Greco also notes that he asked the police officers to remove his handcuffs because they were too

---

[19]Plaintiff cites *Ticey v. Peters*, 8 F.3d 498 (7th Cir. 1993), for the proposition that "'[i]f a statement is proximate in time to the event, less opportunity for fabrication exists.'"  (Doc. No. 30 at 39 (quoting *Ticey*, 8 F.3d at 503).  There, the court concluded that a statement which was made by a victim about the identity of her attacker was reliable, in part, because it was made within hours of the incident.  *Ticey*, 8 F.3d at 503.  She also relies on *Turbyfill v. International Harvester Co.*, 486 F. Supp. 232 (E.D. Mich. 1980), for the same point.  In *Turbyfill*, a mechanic made a handwritten statement about an accident the same day it occurred.  *Id.* at 234.  While we agree with Plaintiff that less opportunity for fabrication exists when a statement is proximate to the time of an event, no such temporal proximity exists between Greco's arrest and the creation of his written statement.

[20]Greco was not under oath at any point when he made his statement.

painful.  (Börger-Greco Dep. at 86.)  However, Drury testified that Greco never complained that the handcuffs were causing him pain.  (Drury Dep. at 203.)  In addition, several of the details that are contained in Greco's second entry, which he made a month after the first entry, contradict his earlier written observations:  (1) in the first entry, Greco notes that the police officers arrived approximately twenty-five (25) minutes after the conductor spoke to him (Börger-Greco Dep. at 84), while the second entry notes that the police officers arrived approximately thirty-five (35) or forty (40) minutes after the conductor spoke to him (*id.* at 90); (2) in the first entry, Greco only makes mention of one conductor (*id.* at 83-84), while in the second entry he explains that "there were more than three conductors" (*id.* at 90); and (3) in the second entry, Greco notes that the police officers accused him "of being an old bastard, an old fart and a son of a bitch," even though these terms are absent from the first entry.  (*Id.* at 91.)  After reviewing all of these circumstances, we conclude that the guarantees of trustworthiness do not support the admission of Greco's written statement under the residual exception to the hearsay rule.

### 2. Probative value of written statement

In order to be admissible under Rule 807's residual exception to the hearsay rule, the proponent of the hearsay statement must show that it is "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." Fed. R. Evid. 807; *see also In re Japanese Elec. Prods. Antitrust Litig.*, 723 F.2d 238, 301-02 (3d Cir. 1983), *rev'd and remanded on other grounds*, 475 U.S. 574 (1986).  A statement "will be considered 'more probative' if the court determines that the hearsay is relevant and reliable, and that no other evidence, or very little other evidence, is available on the same point."  5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 807.03[3][a] (2d ed. 2000).

In addition to the reliability problems inherent in Greco's written statement, other sources of evidence are available regarding many of the same points for which Plaintiff seeks to offer the hearsay statement. We will permit Plaintiff to rely on statements that Greco made to his physicians and psychologist during the course of treatment he received after his arrest. Plaintiff also obtained testimony from Camps-Mathis, Schultz, and Wigod, each of whom witnessed Greco's altercations with Amtrak personnel and provided evidence in support of Plaintiff's claims. *Leinberry v. Anes Elecs., Inc.*, Civ. No. 90-4574, 1992 U.S. Dist. LEXIS 2264, at *11 (E.D. Pa. Feb. 24, 1992). Plaintiff has the ability to subpoena many of these witnesses to testify at trial. *Polansky v. CNA Ins. Co.*, 852 F.2d 626, 631 (1st Cir. 1988). In addition to the inherent unreliability of the proffered hearsay statement, we will exclude the statement because it lacks sufficient probative value.

### B.   Admissibility of Statements Made by Greco to Plaintiff Under Federal Rule of Evidence 807

At approximately 8:00 p.m. on September 18, 2000, Plaintiff recounted to his wife what happened to him on the Amtrak train earlier that day. (Börger-Greco Dep. at 57.) Defendant seeks to exclude these hearsay statements. (Doc. No. 27 at 13.) Plaintiff argues that these statements are also admissible under Federal Rule of Evidence 807. (Doc. No. 30 at 42.)

In evaluating whether these statements have sufficient guarantees of trustworthiness, we consider the same factors discussed above. After balancing these factors, we conclude that Greco's statements to his wife are not admissible under the residual exception to the hearsay rule. Several factors weigh in favor of admission of these statements. As with his written statement, the oral statements that Greco made to his wife were made voluntarily, were based on his

personal knowledge, and did not contradict any prior statements.[21]   The statements were also made in closer proximity in time to the events described than the written statement, which suggests that Greco's memory would have been more clear.

However, many of the same concerns exist that led to our decision to preclude the admission of Greco's written statement.  Greco was not under oath when he made any of his statements to his wife, and Defendants did not have the opportunity to cross-examine Greco regarding his oral statements.[22]   Furthermore, Greco's oral statements, which were not spontaneous, were made to Plaintiff's wife who has a significant interest in this litigation.[23]   *See Bailey*, 581 F.2d at 349 (stating that a court should give consideration "to factors bearing on the reliability of the reporting of the hearsay by a witness").   When a family member seeks to admit hearsay statements made by the decedent prior to his death in order to establish the cause of his injury, such statements are inherently unreliable.  *Rock v. Huffco Gas & Oil Co., Inc.*, 922 F.2d 272, 282 (5th Cir. 1991); *cf. Ticey*, 8 F.3d at 499, 503 (holding that statement made by victim to police detective was reliable).   Based upon a review of all of the circumstances, we conclude that there are insufficient guarantees of trustworthiness to permit the admission of Greco's oral statements to Plaintiff under Rule 807.

### C.   Admissibility of Statements Made by Greco Under Federal Rule of Evidence

---

[21]Again, there is insufficient evidence in the record to determine whether Greco made these oral statements in anticipation of litigation.

[22]In addition, since Greco's statements were not videotaped, the jury is unable to evaluate his demeanor.

[23]Börger-Greco testified on April 8, 2003, about what her husband told her on September 18, 2000, which is more than thirty months after his arrest and after the beginning of the instant litigation.

803(4)

Defendant seeks to exclude certain statements that Greco made to his physicians and psychologist during the course of the treatment that he received after his arrest.  (Doc. No. 27 at 13-14.)  Plaintiff argues that these statements are admissible under Federal Rule of Evidence 803(4).  Again, a court may not consider hearsay statements that would be inadmissible at trial. *Blackburn*, 179 F.3d at 95 (citing *Philbin*, 101 F.3d at 961 n.1).  We must therefore consider whether certain statements made by Greco to his physicians and psychologist are admissible under the Federal Rules of Evidence.

Under Rule 803(4), a court may admit the following hearsay evidence:  "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment."  Fed. R. Evid. 803(4).  A statement should be admitted under Rule 803(4) to the extent that it describes the cause of a patient's injuries.  *Leinberry*, 1992 U.S. Dist. LEXIS 2264, at *8-9.  However, "to the extent that the statement alleges fault, it does not fall within the exception[.]"  *Id.* at *9 (citing Fed. R. Evid. 803(4) advisory committee's note).  Subsequent to Greco's September 18, 2000, arrest, he provided information to various treating physicians about what he believed caused his injuries.  For instance, Dr. Lyet's notes regarding his examination of Greco on September 21, 2000, reflect that Greco complained that he suffered right forefront and lateral right hip pain after he was "thrown to the ground" while he was returning from New York City to Lancaster.[24]  (Doc.

---

[24]"Since it may be assumed that doctors do not want to waste their time with extraneous history, a doctor's having taken down information amounts to prima facie evidence that it was pertinent."  5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* §

No. 26 Ex. 5.)  Dr. Shultz's notes regarding a November 14, 2000, examination of Greco state

that "[a]t the Trenton station he had problems with conductor and police officer, which [sic] he

was threw [sic] onto the ground and handcuffed and has injuries resulting in severe low back

pain as well as both hip pain radiating down to both lower extremities."  (Doc. No. 27 Ex. I.)

Other treatment notes prepared by Dr. Shultz explain that:

> This current episode or scenario started around the nineteenth of September when
> he was coming from New York City to Lancaster and on the train in Trenton
> because of his stating that he had to have the whole seat rather than part of the seat
> the conductor called the police onto the train, they grabbed him, manhandled him,
> took him out onto the platform, threw him to the ground, and handcuffed him,
> causing obviously some damage to his back and the right hip area, previously
> having both hips replaced.

(*Id.*)  Greco made each of these statements to his treating physicians in order to provide critical

background information about what he believed caused his various injuries.  These histories from

treating physicians may be admitted under Rule 803(4).

In reviewing whether Rule 803(4) is applicable, the critical factor to consider in assessing

reliability is the declarant's motive to ensure proper diagnosis and treatment.  *See Williams v.

Gov't of Virgin Islands*, 271 F. Supp. 2d 696, 704 (D.V.I. 2003) (citing Fed. R. Evid. 803(4)).

Thus, this exception to the hearsay rule may apply to statements that are made to individuals

other than physicians.  *See, e.g., United States v. Newman*, 965 F.2d 206, 210 (7th Cir. 1992)

(holding that a psychologist's testimony was admissible under Rule 803(4)); *Williams*, 271 F.

Supp. 2d at 704 (concluding that statements made to counselor and social worker were

admissible under Rule 803(4)).  In *United States v. Newman*, the Seventh Circuit concluded that

psychological counseling falls within the ambit of Rule 803(4), observing:

---

807.09[7] (2d ed. 2000).

> The idea behind the rule is that a person who believes that he is or may be ill or injured has a strong incentive to tell the professional from whom he seeks diagnosis or treatment the truth about his medical history, symptoms, etc. because if he doesn't it will be harder for the professional to diagnose his problem and treat it effectively.  The rationale applies as forcefully to a clinical psychologist as to a physician, and warrants us in reading "medical" broadly.

*Newman*, 965 F.2d at 210 (citations omitted).

Over the course of two treatment sessions, Greco told Dr. Wittmaier, his psychologist,

about what occurred to him on September 18, 2000:

> Regarding the incident in question, [Greco] reported that he was riding the train from New York to Philadelphia.  He was not feeling well, had placed his bag in the adjoining seat and was somewhat slumped over it resting.  At some point during the trip a young women [sic] asked to use the seat.  He indicated he was not feeling well and asked that he could continue as he was.  Shortly the conductor came, asked him to move, and he again requested that he stay as he was because he was not feeling well.
> Somewhat later the conductor arrived and said "there's the son of a bitch." He was immediately grabbed by two men, pulled from his seat, his arms were forced behind him, his hands were handcuffed and he was dragged from the train and dumped on the platform, at which point he felt sharp pain in his foot.  He said he was never told why he was treated in such a fasion.  He was detained for some time, finally having the cuffs removed when he complained about how much his arms were hurting.  He did not remember offering any resistance or even feeling able to do so.  He did not remember any attempt to deal with him reasonably or without force other than the conductor's initial request.  He did not remember any response by the conductor when he asked to be allowed to remain as he was.

(Doc. No. 26 Ex. 11.)

Based on Greco's account of what happened on September 18, 2000, Dr. Wittmaier made

the following diagnosis:

> Since the incident he showed classic signs of Posttraumatic Stress Disorder, including:  1) recurrent and distressing recollections; 2) recurrent distressing dreams; 3) flashbacks[;] and 4) physiological reactivity upon remembering the event.  He tried to stop thinking about the incident (unsuccessfully), felt constricted in his affective responses and expressed hopelessness.  He had difficulty sleeping, difficulty concentrating, was easily startled and felt depressed.  The symptoms had

persisted for a month and were clearly caused by the event on the train.[25]

(Doc. No. 26 Ex. 11.)  In order to assist Dr. Wittmaier in making a proper diagnosis and in

offering appropriate treatment, Greco had a strong incentive to tell Dr. Wittmaier the truth about

the events which led him to seek his assistance.  Thus, his statements to Dr. Wittmaier are

admissible under Rule 803(4).

## IV.     LEGAL ANALYSIS

### A.       42 U.S.C. § 1983

Plaintiff asserts a claim against all Defendants under 42 U.S.C. § 1983, which provides in

pertinent part that:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in an action at law, suit in
> equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (2000).  Section 1983 does not create substantive rights.  *Doe v. Delie*, 257

F.3d 309, 314 (3d Cir. 2001).  Rather, it provides a remedy "for any person who has been

deprived of rights secured by the Constitution or laws of the United States by a person acting

under color of law."  *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002) (citing *Gruenke v. Seip*,

225 F.3d 290, 298 (3d Cir. 2000)); *see also Kneipp v. Tedder*, 95 F.3d 1199, 1204 (3d Cir. 1996).

Thus, a plaintiff must prove an underlying statutory or constitutional violation in order to prevail

---

[25]Dr. Wittmaier summarized the information that Greco provided to him during the
course of Greco's treatment, as well as his diagnosis of Posttraumatic Stress Disorder, in a letter
to an attorney who presumably represented Plaintiff at some point.  It is unclear whether this July
10, 2001, letter, was prepared in anticipation of the litigation in the instant case, which began on
August 21, 2002.  (Doc. No. 1.)  We assume that this information came from his treatment notes.

under 42 U.S.C. § 1983.  *See, e.g., Daniels v. Williams*, 474 U.S. 327, 330 (1986) (holding that in

order to recover in a § 1983 suit, a "plaintiff must still prove a violation of the underlying

constitutional right"); *A.M. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572, 579 (3d Cir.

2004); *Doe*, 257 F.3d at 314.

      In approaching the merits of a § 1983 claim, a court's "[a]nalysis begins by identifying

the 'exact contours of the underlying right said to have been violated' and then determining

'whether the plaintiff has alleged a deprivation of a constitutional right at all.'"  *A.M.*, 372 F.3d at

579 (quoting *Nicini v. Morra*, 212 F.3d 798, 806 (3d Cir. 2000)).  While Plaintiff raises a whole

host of state law claims against Defendants, Plaintiff's First Amended Complaint is imprecise

regarding the substantive statutory and constitutional violations it raises pursuant to

§ 1983.[26]  In responding to Defendant's Motion for Summary Judgment, Plaintiff argues that

Defendants Drury and Molloy violated § 1983 when they used excessive force in the process of

effecting the unlawful arrest of Greco (Doc. No. 26 at 44) and that Defendant Baldwin violated

§ 1983 when he caused Greco to be arrested unlawfully.  (*Id.* at 37.)  The Fourth Amendment

prohibits a police officer from arresting an individual without probable cause, and prohibits the

---

[26]Count I of Plaintiff's Amended Complaint avers in pertinent part that:

    Defendants and each of them, acting individually and in concert, and under color of
    state law and as a part of a pattern and practice of unlawful activity caused by the
    lack of appropriate training and intentional indifference and as approved and
    condoned by defendant AMTRAK as part of its official policy, practice or custom,
    without immunity or justification, intentionally or in gross disregard and
    indifference to the rights of Jose Greco, subjected plaintiff's decedent, or caused
    him to be subjected to the deprivation of the rights, privileges and immunities
    secured by the United States Constitution and federal laws, all in direct violation of
    the provisions of the Civil Rights Act of 1870, 42 U.S.C. § 1983.

(First Am. Compl. ¶ 33.)

use of excessive force during the course of an arrest.  *Graham v. Connor*, 490 U.S. 386, 395

(1989); *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995).  Thus, there appear

to be two underlying constitutional violations:  (1) arresting an individual without probable

cause; and (2) using excessive force to effect that arrest.  As discussed below, there are genuine

issues of material fact regarding whether Greco's Fourth Amendment rights were violated when

he was arrested and escorted from the Amtrak train.

1.      § 1983 Claim Against Defendants Drury and Molloy

_____Plaintiff asserts that Defendants Drury and Molloy are liable under § 1983 because they

arrested Greco without probable cause and used excessive force to effect that arrest.  Defendants

Drury and Molloy both seek to invoke the doctrine of qualified immunity.  (Doc. No. 24 at 19.)

Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."

*Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Under this doctrine, "officers performing

discretionary functions are 'shielded from liability for civil damages insofar as their conduct does

not violate clearly established statutory or constitutional rights of which a reasonable person

would have known.'"  *Curley*, 298 F.3d at 277 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982)).

In reviewing the merits of a claim of qualified immunity, a court must conduct a two-step

inquiry.  First, it must determine whether "the facts alleged show the officer's conduct violated a

constitutional right."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Hope v. Pelzer*, 536

U.S. 730, 736 (2002); *Donahue v. Gavin*, 280 F.3d 371, 378 (3d Cir. 2002) (explaining that a

court "must 'determine first whether the plaintiff has alleged a deprivation of a constitutional

right at all' when a government official raises qualified immunity as a defense to an action under

22

§ 1983" (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 842 n.5 (1998))).  If the facts, when viewed in the light most favorable to the plaintiff, do not show that the officer violated a constitutional right, then plaintiff's § 1983 claim fails.  *Curley*, 298 F.3d at 277.

Once a court determines that there is sufficient evidence to conclude that the officer did commit a constitutional violation, then it must assess whether the right was clearly established at the time he acted.  *Saucier*, 535 U.S. at 201; *Curley*, 298 F.3d at 277; *Mellott v. Heemer*, 161 F.3d 117, 121 (3d Cir. 1998).  If an officer violated a clearly established constitutional right, then he may not rely on the defense of qualified immunity.  *Curley*, 298 F.3d at 277.  As the Supreme Court explained in *Saucier*, a court must conduct this second level of analysis to determine whether an officer's conduct is subject to qualified immunity:

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct.  It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts.  An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances.  If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the qualified immunity defense.

*Saucier*, 533 U.S. at 205.  Summary judgment is proper if no reasonable factfinder could conclude that the Defendant police officers violated Greco's clearly established rights.  *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000).

       a.     Qualified immunity as applied to excessive force claim

Plaintiff asserts that Defendants Drury and Molloy used excessive force against Greco when they arrested him on September 18, 2000, in violation of the Fourth Amendment to the United States Constitution.  (Doc. No. 26 at 44.)  "In addressing an excessive force claim brought

23

under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham*, 490 U.S. at 394.  When the alleged violation arises from an arrest, the Fourth Amendment is implicated.  *Id.* at 395; *see also Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) (noting that "excessive force in the course of an arrest is properly analyzed under the Fourth Amendment, not under substantive due process" (citing *Graham*, 490 U.S. at 393-94)).

       To prevail on an excessive force theory under the Fourth Amendment, a plaintiff must show that there was a seizure and that the use of force "is excessive under objective standards of reasonableness." *Saucier*, 533 U.S. at 201-02; *see also Curley*, 298 F.3d at 279 (citing *Abraham*, 183 F.3d at 288).  "A seizure occurs 'whenever an officer restrains the freedom of a person to walk away.'" *Curley*, 298 F.3d at 279 (quoting *Tennessee v. Garner*, 471 U.S. 1, 7 (1985)).  Here, Drury and Molloy restrained Greco's freedom when they placed him under arrest.  *See Russoli v. Salisbury Township*, 126 F. Supp. 2d 821, 840 (E.D. Pa. 2000) ("Arrests made by police officers are classic seizures within the meaning of the Fourth Amendment." (citing *Terry v. Ohio*, 392 U.S. 1, 16 (1968))).

       In reviewing whether a seizure was unreasonable, a court must determine whether the officer's "actions were objectively reasonable in light of the facts and circumstances confronting him, regardless of his underlying intent or motivation." *Curley*, 298 F.3d at 279 (internal quotations omitted); *see also Graham*, 490 U.S. at 396 (noting that a court must conduct its inquiry "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight").  The amount of permissible force that may be used to effectuate an arrest is based on the totality of the circumstances. *Graham*, 490 U.S. at 396.  In this context, "'totality'

24

is an encompassing word.  It implies that reasonableness should be sensitive to all of the factors

bearing on the officer's use of force."  *Abraham*, 183 F.3d at 291.  In reviewing the totality of the

circumstances, a court should consider "whether the suspect posed an immediate threat to the

safety of the officer or others, whether the suspect was actively resisting arrest, and the severity

of the crime at issue."[27]  *Curley*, 298 F.3d at 279 (citing *Abraham*, 183 F.3d at 289).

   We are unable to determine whether either Drury or Molloy exerted excessive force

against Greco before he exited the train.[28]  The parties disagree about what happened when Drury

and Molloy approached Greco.  Baldwin, Camps-Mathis, Drury, and Molloy testified that Drury

and Molloy had a verbal exchange with Greco before he was arrested.  (Baldwin Dep. at 81;

Camps-Mathis Dep. at 10; 2/24/04 Drury Dep. at 123-25, 130; Molloy Dep. at 71, 79.)  After

Drury made the decision to arrest Greco, Drury grabbed him and removed him from the seats in

_____

   [27]In discussing the reasonableness standard in the context of reviewing a motion for
summary judgment in an excessive force claim under § 1983, the Third Circuit has emphasized
that the issue of whether an officer's conduct was reasonable should often be left to a jury:

   Reasonableness under the Fourth Amendment resembles tort law in its attention to
   how a specific, concrete circumstance should affect an officer's judgment.  This
   sensitivity to context suggests that regardless of whether objective reasonableness
   invokes a different and heightened standard from negligence, reasonableness under
   the Fourth Amendment should frequently remain a question for the jury.  To put
   the matter more directly, since we lack a clearly defined rule for declaring when
   conduct is reasonable in a specific context, we rely on the consensus required by a
   jury decision to help ensure that the ultimate legal judgment of "reasonableness" is
   itself reasonable and widely shared.

*Abraham*, 183 F.3d at 290.

   [28]Because Greco's purported intoxication may have influenced the amount of force that
Drury and Molloy used to arrest him, we will permit Drury and Molloy to testify about the extent
to which Greco's behavior and appearance led them to conclude that Greco was intoxicated.
Such evidence is not precluded by Federal Rule of Evidence 403.

order to get Greco to stand up.  (2/24/04 Drury Dep. at 137-38; Molloy Dep. at 83.)  In contrast

to this evidence, Greco asserts that "[h]e was immediately grabbed by two men" and "pulled

from his seat."  (Doc. No. 26 Ex. 11.)  The parties also disagree about what occurred as Greco

was escorted down the train aisle.  Defendants testified that Drury handcuffed Greco while they

were still on the train and began to escort him from the car, with Drury's left hand on Greco's

shoulder or left arm.  (2/24/04 Drury Dep. at 138; 7/30/04 Drury Dep. at 200, 202.)  Molloy

walked down the aisle of the train car behind Drury and Greco.  (Molloy Dep. at 85-86.)  At

some point, however, Molloy also held Greco as he was being escorted from the train.  (Baldwin

Dep. at 82, 86.)  Greco's account differs because he asserts that "he was dragged from the train."

(Doc. No. 26 Ex. 11.)  The record, according to Plaintiff, does not suggest that Greco posed an

immediate threat to the safety of the officer or others at that point.  To the contrary, Molloy

testified that, as he was being taken down the aisle of the train, Greco "was screaming at the top

of his lungs, 'I'm an old man, what are you doing, leave me alone.'"  (*Id.* at 85-86.)

Furthermore, Greco was only arrested for the crime of disorderly conduct.  We recognize that

"the right to make an arrest . . . necessarily carries with it the right to use some degree of physical

coercion or threat thereof to effect it."  *Graham*, 490 U.S. at 396 (citing *Terry*, 392 U.S. at 22-

27).  However, based on the disputed material facts regarding what transpired when Drury and

Molloy approached Greco and then escorted him from the train, a jury must assess the conflicting

evidence to determine whether either Drury or Molloy used excessive force against Greco.

    The presence of conflicting evidence also prevents us from deciding whether Drury used

excessive force when he removed Greco from the train to the platform.[29]  The parties dispute
what happened as Drury removed Greco from the train to the train platform.  Drury testified that
Greco fell onto the platform when Greco "placed his foot in between my foot and we stumbled"
(2/24/04 Drury Dep. at 138), but that Drury broke Greco's fall.  (*Id.* at 197.)  According to Greco,
he "was dragged from the train and dumped on the platform"  (Doc. No. 26 Ex. 11) or "thrown to
the ground."  (*Id.* Ex. 5.)  Molloy did not see this incident occur because he was still in the aisle
of the train.  (Molloy Dep. at 92.)  When he turned the corner to exit the train, Drury was on top
of Greco, "as if they just fell."  (*Id.*)  Molloy further explained that Drury "fell on top of" Greco.
(*Id.*)  If Plaintiff's evidence is believed, a jury could conclude that Drury used excessive force
against Greco.  Because there are disputed issues of material fact, we are unable to determine at
this juncture whether Drury violated Greco's Fourth Amendment rights, exerting excessive force
by throwing him from the train to the platform.  Molloy did not assist Drury in escorting Greco
from the train to the train platform.  Therefore, there is no evidence that Molloy exerted any force
against Greco at that point.

Because critical facts regarding what happened to Greco are disputed, we are also unable

---

[29]"[T]he standard for granting or denying a motion for summary judgment does not
change in the qualified immunity context."  *Karnes v. Skrutski*, 62 F.3d 485, 494 (3d Cir. 1995).

to determine whether Drury and Molloy violated a clearly established right.[30]   A court should not

make a decision about an officer's qualified immunity "when there are unresolved disputes of

historical fact relevant to the immunity analysis."  *Curley*, 298 F.3d at 278.  The Third Circuit

has explained that, while it is the role of the court to decide whether an officer violated a clearly

established constitutional right, "the existence of disputed, historical facts material to the

objective reasonableness of an officer's conduct will give rise to a jury issue."  *Id.* (citing *Sharrar*

*v. Felsing*, 128 F.3d 810, 828 (3d Cir. 1997)).  Under the circumstances, we cannot determine

whether Drury and Molloy are entitled to the defense of qualified immunity.

b.     Qualified immunity as applied to false arrest claim

Plaintiff asserts that Defendants Drury and Molloy lacked probable cause to arrest him, in

violation of the Fourth Amendment to the United States Constitution.  The Fourth Amendment

prevents a police officer from arresting a citizen without probable cause.  *Orsatti*, 71 F.3d at 482.

A warrantless public arrest does not violate the Fourth Amendment "where there is probable

cause to believe that a criminal offense has been or is being committed."  *Devenpeck v. Alford*,

125 S. Ct. 588, 593 (2004).  Therefore, to prevail on a § 1983 claim for false arrest, a plaintiff

---

[30]"'Clearly established' for purposes of qualified immunity means that the 'contours of
the right must be sufficiently clear that a reasonable official would understand that what he is
doing violates that right."  *Wilson v. Layne*, 526 U.S. 603, 614-15 (1999) (quoting *Anderson v.
Creighton*, 483 U.S. 635, 640 (1987)).  Thus, in reviewing whether an officer's conduct violated
a clearly established right, a court must determine "whether it would be clear to a reasonable
officer that his conduct was unlawful in the situation he confronted."  *Saucier*, 535 U.S. at 201
(citing *Wilson*, 526 U.S. at 615).  When a plaintiff alleges that an officer exerted excessive force
against him, the doctrine of qualified immunity acts "to protect officers from the sometimes hazy
border between excessive and acceptable force and to ensure that before they are subjected to
suit, officers are on notice their conduct is unlawful."  *Saucier*, 533 U.S. at 206 (internal
quotation omitted); *see also id.* at 202 ("If the law did not put the officer on notice that his
conduct would be clearly unlawful, summary judgment based on qualified immunity is
appropriate.").

must establish that he was arrested without probable cause.  *Santiago v. City of Vineland*, 107 F. Supp. 2d 512, 561 (D.N.J. 2000).

Probable cause may only exist when there is "proof of facts and circumstances that would convince a reasonable, honest individual that the suspected person is guilty of a criminal offense." *Lippay v. Christos*, 996 F.2d 1490, 1502 (3d Cir. 1993).  A court must review the totality of the circumstances to assess whether an officer had probable cause to arrest an individual.  *Sharrar*, 128 F.3d at 818 (citing *United States v. Glasser*, 750 F.2d 1197, 1205 (3d Cir. 1984)).  In determining whether an officer had probable cause for an arrest, a court, in reviewing the totality of the circumstances, must "examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause." *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

In a § 1983 action, a jury generally should determine whether an officer had probable cause to make an arrest.  *Sharrar*, 128 F.3d at 818.  However, "'where no genuine issue as to any material fact exists and where credibility conflicts are absent, summary judgment may be appropriate.'"  *Id.* (quoting *Deary v. Three Un-Named Police Officers*, 746 F.2d 185, 192 (3d Cir. 1984)); *see also Montgomery*, 159 F.3d at 124.  Baldwin told Drury and Molloy that Greco was using two seats, refused to relinquish the second seat, used abusive language toward the woman who wanted his seat, and used profane language toward him.[31]  (2/24/04 Drury Dep. at 117, 133-34.)  After Molloy requested that Greco move, Greco became upset and argumentative,

---

[31]During Greco's exchange with Baldwin, Greco asked Baldwin why he was "f---ing with him."  (Baldwin Dep. at 71.)

told Drury and Molloy "to get the f--- off the train" and to "leave me the f--- alone," and

continued to lay across two seats.  (Baldwin Dep. at 81-82; 2/24/04 Drury Dep. at 124-25;

Molloy Dep. at 71.)  Drury decided to arrest Greco based on his assessment that Greco's

statements and conduct were threatening.[32]  (2/24/04 Drury Dep. at 131, 135; 7/30/04 Drury Dep.

at 189; *see also* 2/24/04 Drury Dep. at 130 ("Mr. Greco became louder and louder and more

profane, he got highly agitated, aggravated, he what I consider started to use threatening behavior

at that time . . . ."); Molloy Dep. at 45.)  However, summary judgment is not appropriate because

critical factual discrepancies and credibility conflicts exist regarding the existence of probable

cause.  Specifically, there are differing accounts about whether Greco was intoxicated and

whether he communicated to Amtrak personnel that he was ill.  In the Incident Report for

Greco's arrest,[33] Drury noted that the arrest was alcohol-related and that Greco's speech was

slurred.  (Doc. No. 26 Ex. 38.)  He also wrote that he "noticed a strong smell of an alcoholic

beverage coming from Mr. Greco" (*id.*) and testified that Baldwin told him that Greco appeared

to be intoxicated.  (2/24/04 Drury Dep. at 117.)  However, Baldwin, Champs-Mathis, Schultz,

and Wigod testified that Greco's appearance and behavior did not suggest that he had been

---

[32]Molloy provided backup assistance to Drury.  (Molloy Dep. at 45.)

[33]Drury arrested Greco for engaging in disorderly conduct in violation of N.J. Stat. Ann. §
2C:33-2a.  (Doc. No. 26 Ex. 38.)  This provision prohibits the use of improper behavior:

> A person is guilty of a petty disorderly persons offense, if with purpose to cause
> public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he
> (1) [e]ngages in fighting or threatening, or in violent or tumultuous behavior; or (2)
> [c]reates a hazardous or physically dangerous condition by any act which serves no
> legitimate purpose of the actor.

N.J. Stat. Ann. § 2C:33-2a (2005); *see also New Jersey v. Stampone*, 775 A.2d 193, 197 (N.J.
Super. Ct. App. Div. 2001).

drinking or that he was intoxicated.[34]   (Baldwin Dep. at 88; Champs-Mathis Dep. at 120; Schultz

Dep. at 20, 27; Wigod Dep. at 17, 31.)  Greco also asserted that he told Baldwin that he was not

feeling well.  (Doc. No. 26 Ex. 11.)  However, Wigod did not hear Greco tell Baldwin that he

was ill.  (Wigod Dep. at 31.)  The record is also unclear regarding whether Baldwin

communicated this information to Drury and Molloy.

    This testimony, when viewed in the light most favorable to Plaintiff, creates a genuine

issue of material fact regarding whether Drury and Molloy had probable cause to arrest Greco for

violating New Jersey's disorderly conduct statute.[35]   The District of New Jersey's approach to the

issue of qualified immunity in *Mantz v. Chain*, 239 F. Supp. 2d 486, 498 (D.N.J. 2002), is

instructive here.  In *Mantz*, plaintiff was similarly arrested for violating N.J. Stat. Ann. § 2C:33-

2a.  The testimony of the plaintiff and the arresting officer differed greatly on key issues of fact.

Thus, the court could not conclude whether the officer had probable cause to arrest the plaintiff.

*Id.*  The court also explained that it was premature to decide the qualified immunity issue because

the disputed facts made it impossible to determine whether the police officer's actions were

objectively reasonable.  *Id.*  Because there are genuine issues of material fact, we too are unable

to determine whether Drury and Molloy had probable cause to arrest Greco.  Since these disputed

---

[34]Because Greco's purported intoxication may have contributed to the existence of
probable cause to arrest him for disorderly conduct, we will permit evidence about the extent to
which Greco's behavior and appearance on the train suggested that Greco was intoxicated.  We
will also permit Defendants to rely on circumstantial evidence regarding whether Greco drank
alcohol prior to boarding the train.  *See Patzig v. O'Neil*, 577 F.2d 841, 848-49 (3d Cir. 1978).
Such evidence is not precluded by Federal Rule of Evidence 403.

[35]Even though Drury, and not Molloy, made the decision to arrest Greco (2/24/04 Drury
Dep. at 135; 7/30/04 Drury Dep. at 189), Molloy provided backup assistance to Drury (Molloy
Dep. at 45) and helped Drury escort Greco off of the train.  (Baldwin Dep. at 82, 86.)

factual issues exist, it also would be premature to determine that Drury and Molloy's actions did not violate a clearly established right.

<u>2.        § 1983 Claim Against Defendant Baldwin</u>

Defendant Baldwin argues that the § 1983 claim against him should be dismissed because Plaintiff fails to show that Baldwin's conduct toward Greco constituted a constitutional violation. (Doc. No. 24 at 13.)  Plaintiff asserts that Baldwin violated § 1983 when he "authorized and directed Officers Drury and Molloy to board the Amtrak train in Trenton and arrest Greco." (Doc. No. 26 at 37.)  Plaintiff avers that "Baldwin violated Greco's constitutional rights by providing false information to Officers Drury and Molloy and by authorizing and directing them to appear at the scene to arrest Greco without probable cause."  (*Id.* at 39.)

"Absent immunity or an adequate defense, a person who, acting under color of state law, directly and intentionally applies the means by which another is seized in violation of the Fourth Amendment can be held liable under § 1983.  As a general rule, a government official's liability for causing an arrest is the same as for carrying it out."  *Berg v. County of Allegheny*, 219 F.3d 261, 271-72 (3d Cir. 2000) (citing *Kilbourn v. Thompson*, 103 U.S. 168, 200 (1880)).  In *Berg*, the Third Circuit further noted that "§ 1983 liability can extend beyond the arresting officer to other officials whose intentional actions set the arresting officer in motion."  *Id.* at 272; *see also id.* ("As the Supreme Court has explained, § 1983 anticipates that an individual will be 'responsible for the natural consequences of his actions.'" (quoting *Malley v. Briggs*, 475 U.S. 335, 344 n.7 (1986))).

Even though Baldwin, as an Amtrak conductor, does not have the authority to remove a passenger from a train (Camps-Mathis Dep. at 69), he has the discretion to contact Amtrak police

32

officers when confronted with an uncooperative passenger.[36]   (Baldwin Dep. at 76.)  Baldwin

told Drury and Molloy that Greco was using two seats, refused to relinquish the second seat, used

abusive language toward the woman who wanted his seat, and used profane language toward

him.  (2/24/04 Drury Dep. at 117, 133-34.)  Drury also testified that Baldwin told him that Greco

appeared to be intoxicated.[37]   (*Id.*)  The officers approached Greco after Baldwin pointed him out

and said "there's the son of a bitch."  (Baldwin Dep. at 80; 2/24/04 Drury Dep. at 123; Doc. No.

26 Ex. 11.)  As discussed above, we conclude that there are disputed issues of material fact

regarding whether Defendant Drury had probable cause to arrest Greco.  Baldwin provided

information to Drury which led him to arrest Greco.  Under the circumstances, Baldwin may be

held liable under 42 U.S.C. § 1983.

### 3.      § 1983 Claim Against Defendant Amtrak

Plaintiff alleges that Amtrak's treatment of Greco violated § 1983.[38]   In a § 1983 case,

Amtrak cannot be held liable under a theory of respondeat superior.  *Monell v. Dep't of Soc.*

*Servs.*, 436 U.S. 658, 691 (1978).  Instead, Plaintiff must identify a specific Amtrak policy or

---

[36]Amtrak's Manual of Instruction for Transportation Department Employees states that "[p]olice should be summoned when the conductor believes such action is necessary to protect property or to assure the safety of passengers (including the passenger removed from the train) or employees."  (Doc. No. 26 Ex. 37 at I-22.)

[37]Because Greco's purported intoxication may have influenced Drury's probable cause calculus in deciding to arrest him, we will permit Baldwin to testify about the extent to which Greco's behavior and appearance led him to conclude that Greco was intoxicated.  Such evidence is not precluded by Federal Rule of Evidence 403.

[38]Amtrak "is an agency or instrumentality of the United States for the purpose of individual rights guaranteed against the Government by the Constitution."  *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 394 (1995).  As a result, it is subject to suit under § 1983.  *See Oshatz v. Amtrak*, Civ. A. No. 03-351, 2003 WL 22872038, at *1 (E.D. Pa. Nov. 18, 2003).

custom that proximately caused the violation of Greco's constitutional rights.[39]  *Berg*, 219 F.3d at

275; *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989).  In order to establish the existence

of either a policy or custom, "a plaintiff must show that an official who has the power to make

policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-

settled custom."  *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990).  In addition to

identifying conduct that is properly attributable to an organization subject to § 1983, the plaintiff

"must also demonstrate that, through its *deliberate* conduct, the municipality was the 'moving

force' behind the injury alleged."  *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

If the policy or custom is facially valid, a plaintiff must establish causation by demonstrating that

the defendant's action "'was taken with deliberate indifference as to its known or obvious

consequences.  A showing of simple or even heightened negligence will not suffice.'"  *Berg*, 219

F.3d at 276 (quoting *Brown*, 520 U.S. at 407).

> a.      Failure to train regarding treatment of sick passengers

Plaintiff asserts that Amtrak violated § 1983 by failing to have a policy governing the way

in which a conductor deals with a sick passenger and by failing to provide adequate training to

Baldwin regarding the treatment of sick passengers.  (Doc. No. 26 at 26.)  Plaintiff's theory

---

[39]A policy is made when a decisionmaker with final authority to establish policy regarding the action "'issues an official proclamation, policy, or edict.'"  *Berg*, 219 F.3d at 275 (quoting *Kneipp*, 95 F.3d at 1212).  A custom is a practice that is "so permanent and well settled as to virtually constitute law."  *Id.* (quoting *Kneipp*, 95 F.3d at 1212).  Custom may be shown through evidence that high-level policymakers knew about and acquiesced to the unconstitutional practice.  *Garvin v. City of Philadelphia*, Civ. A. No. 02-2214, 2003 U.S. Dist. LEXIS 2471, at *5 (E.D. Pa. Feb. 24, 2003) (citing *Fletcher v. O'Donnell*, 867 F.2d 791, 793-94 (3d Cir. 1989), *aff'd*, 354 F.3d 215 (3d Cir. 2003)); *Wakshul v. City of Philadelphia*, 998 F. Supp. 585, 591 (E.D. Pa. 1998)).  Generally, "[p]roof of a single incident by lower level employees acting under color of law does not suffice to establish either an official policy or custom."  *Wakshul*, 998 F. Supp. at 591 (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985)).

appears to be that Amtrak's purported lack of training led directly to Greco's false arrest.  While

Amtrak enforced several rules as of September 18, 2000, regarding passenger seating aboard an

Amtrak train,[40] it did not have any written policy specifically addressing the treatment of a sick

passenger.  To establish § 1983 liability based on a defendant's failure to train its employees, the

plaintiff must show that the failure to train "reflects a 'deliberate' or 'conscious' choice," *Kneipp*,

95 F.3d at 1212, and "that the failure amounts to 'deliberate indifference' to the rights of persons

with whom those employees will come into contact."  *Carter v. City of Philadelphia*, 181 F.3d

339, 357 (3d Cir. 1999) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  To establish

"deliberate indifference" in this context, a plaintiff must show that:  (1) policymakers know that

employees will confront a particular situation; (2) that situation involves a difficult choice or a

history of employee mistakes; and (3) an employee's wrong choice will often cause the

deprivation of a person's constitutional rights.  *Id.* (citing *Walker v. City of New York*, 974 F.2d

293, 297-98 (2d Cir. 1992)).

---

[40]These rules state that:  (1) each passenger who pays a fare is only entitled to one seat, to
the extent that coach seats are available; (2) a passenger is only entitled to one seat per fare; and
(3) Amtrak reserves the right to transfer passengers from one car or train to another car or train.
(Carter Decl. ¶ 5; Doc. No. 24 Ex. L.)  Further, Amtrak's Terms of Transportation Policy states
that it may remove any passenger from a train if:  (1) he has not paid the appropriate fare; (2) his
conduct is objectionable because he is, for instance, intoxicated; (3) his personal hygiene makes
the person offensive; (4) he poses a health or safety hazard to other passengers of Amtrak
employees; or (5) he refuses to comply with safety rules or with instructions of Amtrak
personnel.  (*Id.*)  Amtrak's Manual of Instruction for Transportation Department Employees also
states that "[i]mproper conduct, intoxication, malicious damage to equipment, language or action
offensive and annoying to other passengers, smoking in nonsmoking areas, or refusal to pay the
proper fare, are lawful grounds for removing a passenger from a train.  (Doc. No. 26 Ex. 37 at I-
21.)  However, "[a] passenger should be removed and/or restrained only when other methods,
including a firm request to the passenger, have failed to achieve appropriate conduct, and then
only with the use of such reasonable force as may be necessary under the circumstances, care
being exercised to avoid personal injury."  (*Id.* at I-22.)

35

In the instant case, Plaintiff fails to satisfy her burden of proving that Defendant Amtrak violated § 1983 by failing to have a policy for the treatment of sick passengers.  Plaintiff offers no evidence that Amtrak's failure to have such a policy has resulted in a pattern of constitutional violations by conductors generally or that other passengers complained about Baldwin's treatment of ill passengers.  In fact, Baldwin testified that, prior to September, 2000, he never had a situation where a passenger who purchased one seat was sick and using two seats.  (Baldwin Dep. at 56.)  A defendant's failure to train its employees "can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations."  *Berg*, 219 F.3d at 276 (citing *Brown*, 520 U.S. at 408-09).[41]  There is also no evidence that a conductor's wrong choice in dealing with sick passengers will often result in the deprivation of a passenger's constitutional rights.  *See Moleski v. Cheltenham Township*, Civ. A. No. 01-4648, 2002 U.S. Dist. LEXIS 12311, at *49 (E.D. Pa. Apr. 30, 2002) ("A need for training or other corrective action to avoid imminent deprivations of a constitutional right must be so apparent that any reasonable policymaker or supervisor would have taken appropriate preventive measures.").  The evidence in this record is not sufficient to support the theory that Amtrak exhibited deliberate indifference by failing to have a policy for the treatment of sick passengers or by failing to train Baldwin regarding his treatment of ill passengers.  As a result, Plaintiff may not proceed on this theory of liability against Amtrak.

       b.       Failure to Train, Discipline, or Control Drury and Molloy

---

[41]In *Brown*, the Supreme Court explained that "in a narrow range of circumstances, a violation of federal rights may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations."  *Brown*, 520 U.S. at 409.  Here, it is not "highly predictable" that a failure to train Amtrak conductors regarding the treatment of sick passengers will lead directly to the violation of those passengers' federal rights.

36

Plaintiff also avers that Amtrak violated § 1983 by failing to train, discipline, or control Drury prior to Greco's arrest and by failing to take corrective action against Drury and Molloy for the asserted use of excessive force in arresting Greco.[42]  (Doc. No. 26 at 29.)  A demonstrated failure to train, discipline, or control a police officer may only be actionable under § 1983 "if the plaintiff can show both contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents and circumstances under which the supervisor's actions or inaction could be found to have communicated a message of approval to the offending subordinate." *Montgomery v. DeSimone*, 159 F.3d 120, 127 (3d Cir. 1998) (citing *Bonenberger v. Plymouth Township*, 132 F.3d 20, 25 (3d Cir. 1997)); *see also Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (concluding that a plaintiff who is injured by a police officer may establish that a policy existed by showing that the defendant, "alerted to the possible use of excessive force by its police officers, exhibited deliberate indifference").  Thus, in the context of a failure to train, discipline, or control, a plaintiff must show that the defendant exhibited deliberate indifference.  *Canton*, 489 U.S. at 389; *see also Piotrowski v. City of Houston*, 237 F.3d 567, 581 (5th Cir. 2001) (explaining that a policy "of inadequate officer discipline could be unconstitutional if it was pursued with deliberate indifference toward the constitutional rights of citizens"); *Brown v. Bryan County*, 219 F.3d 450, 459 (5th Cir. 2000) (noting that "with respect to specific officers, a need for more or different training can be so obvious and the inadequacy of training so likely to result in a violation of constitutional rights that the [defendant] can

---

[42]In opposing Defendants' Motion for Summary Judgment, Plaintiff relies entirely on the theory that Amtrak is liable for not preventing Drury and Molloy's use of excessive force in effecting Greco's arrest.  (Doc. No. 26 at 29-37.)  Plaintiff may not pursue the theory that Amtrak was deliberately indifferent to the rights of citizens regarding Drury and Molloy's arrest of individuals without probable cause because Plaintiff offers no evidence to support such a theory.

reasonably be said to have been deliberately indifferent to the need for training") (citing *City*, 489 U.S. at 390).

When a plaintiff alleges that an officer violated his constitutional rights by using excessive force, liability may be imposed under § 1983 if that same officer has a history of such conduct. *See Canton*, 489 U.S. at 391 (emphasizing that the deficiency in the defendant's training "must be closely related to the ultimate injury"); *Maiale*, 2004 U.S. Dist. LEXIS 17442, at *26-27 (citing *Beck v. City of Pittsburgh*, 89 F.3d 966, 973 (3d Cir. 1996)).  It is clear that Drury has a demonstrated history of using inappropriate force in effecting arrests.[43]  Soon after he became employed as an Amtrak police officer in 1986 (2/24/04 Drury Dep. at 8), Drury attended a training course at the Federal Law Enforcement Training Center.  (*Id.* at 8-9.)  As part of that training, Drury participated in a vehicle burglary practical exercise on October 24, 1986.  (Doc. No. 26 Ex. 13.)  During this exercise, the officers being trained were required to determine whether an individual exiting a parked vehicle with a stereo and camera actually owned the vehicle and equipment.  (*Id.*)  After Drury and his partner confronted the suspect and decided to arrest him, they handcuffed him and escorted him to the police car.  After the suspect was placed in the car, he moved slightly to make the handcuffs more comfortable.

The instructor explained that

[a]t this point, Drury shouted at [the suspect], "You move, and I'll f--- you up."

---

[43]We will limit Plaintiff to offering evidence from Drury's psychological records, personnel file, and internal affairs file that are directly related to complaints about his prior use of force in effecting arrests.  Evidence of other kinds of complaints or investigations is not relevant to establishing Amtrak's liability for its failure to train, discipline, or control Drury in the context of arresting citizens.  Fed. R. Evid. 401.  Moreover, any probative value of such evidence is substantially outweighed by the danger of unfair prejudice and confusion of the issues.  Fed. R. Evid. 403.

The suspect said nothing, but apparently he must have moved, because in about one (1) second Drury was totally inside the patrol car, on top of [the suspect] with his left forearm on [the suspect's] throat with his head pushed over the back of the seat.  Drury appeared to be swinging at [the suspect].  I shouted "Out of role" twice.  (This is the first time I have ever had to do this in eight years of working practical exercises.)  And then I heard [the suspect] shout "Out of role."

(Doc. No. 26 at Ex. 14.)

As a result of this experience, the instructor commented:

[i]n my considered opinion, student Drury's actions, both verbal and physical, given the low-key, soft-spoken, small subject he was faced with, with almost no "probable cause", was more than just "error".  It was an "attitude", or a lack of self-control under pressure, and not much pressure at that.  I question whether the student's parent agency will want to have this type of person wearing their badge and uniform and representing them with the public, law abiding or non-law abiding.  He was definitely unsatisfactory in this practical exercise, with me monitoring him.  The unanswered question is, "What will he do on patrol when no one is monitoring him?"

(*Id.*)  Based on this report, Amtrak requested that Drury undergo a psychological evaluation.

(Doc. No. 26 Ex. 14.)  After conducting the evaluation, John J. Barry, Ph.D., concluded in

January, 1987, that "[t]he job effectiveness data seems to show that Mr. Drury *can* effectively

perform the law enforcement job" but that "he has personality characteristics that can seriously

reduce his potential."  (*Id.*)  Based on the evaluation, the psychologist recommended that Drury

participate in an employee assistance program and that Drury's supervisor closely monitor his

performance.  (*Id.*)  Drury did not participate in any counseling after this January, 1987,

evaluation.  (7/30/04 Drury Dep. at 89.)

To establish deliberate indifference, a plaintiff also may point to evidence of deficient

treatment of prior, similar complaints against that officer.  *See Beck*, 89 F.3d at 973-74 (stating

that, because of prior complaints, a reasonable jury could have inferred that municipality had

knowledge of police officer's propensity for violence when effecting an arrest); *Piotrowski*, 237

F.3d at 582 ("A pattern could evidence not only the existence of a policy but also official

deliberate indifference.").  Soon after Drury became a police officer in 1986, three complaints

were filed against him.  (Doc. No. 26 Ex. 15.)  One complainant alleged that "he observed Drury

'throw a subject against a brick building support while effecting an arrest.'"  (*Id.*)  After Internal

Affairs conducted an investigation, it closed the matter and concluded that the charge was not

sustained.[44]  Another citizen alleged that "he was taken to a secluded location, struck in the face,

knocked down and tread upon."  (*Id.*)  In the third complaint, a police officer reported that

"Drury unnecessarily struck a suspect with a nightstick who had been previously brought under

control."  (*Id.*)  As a result of these complaints, Amtrak ordered that Drury undergo a second

psychological review.  After evaluating Drury, Dr. Barry noted in June, 1987, that the "data and

interpretation *does not* reflect any generalized impulsiveness or aggressiveness."  (Doc. No. 16.)

Dr. Barry concluded that Drury "is competent to carry firearms" but recommended that Drury

participate in counseling and that his supervisor monitor his performance.[45]  (*Id.*)  Drury did not

------

[44]Defendant Amtrak may be liable under § 1983 even though it determines that certain complaints lack merit.  As this court explained in *Maiale*,

> [t]he mere fact that charges filed against an officer prior to the conduct which gives rise to the suit were not sustained will not shield a [defendant] from liability.  If this were so, a [defendant] could avoid liability by maintaining a disciplinary system in which charges brought against police officers were impossible to sustain.

*Maiale,* 2004 U.S. Dist. LEXIS 17442, at *28 n.8 (citing *Beck*, 89 F.3d at 973).

[45]J.R. Young, M.D., reviewed the two evaluations that Dr. Barry conducted in 1987 and disagreed with Dr. Barry's assessment.  He concluded "that Richard Drury is not medically qualified to perform the unrestricted duties required of a Police Officer in a safe manner."  (Doc. No. 26 Ex. 26.)

participate in any counseling after this June, 1987, evaluation.  (7/30/04 Drury Dep. at 98.)

Several years after these complaints, two more citizens alleged that Drury used excessive force against them.  In 1997, a citizen filed a state court complaint against Drury alleging that he harassed her while placing her under arrest.  Specifically, the complaint alleged that Drury grabbed the suspect's arms, handcuffed her, and dragged her on the sidewalk.  (Doc. No. 26 Ex. 28.)  On September 23, 1998, Jator King ("King") also filed a complaint against Drury based on Drury's September 22, 1998, arrest of him.  King was traveling on a southbound train from New York.  As the train arrived at Trenton, King became ill and vomited.  (Doc. No. 29.)  Drury and another police officer entered the train and asked him to leave.  (*Id.*)  Even though King said that he was not well and requested that they call an ambulance, the officers escorted him from the train and handcuffed him.  (*Id.*; King Dep. at 21.)  One of the officers struck King two times.[46] (Doc. No. 29.)

There is sufficient evidence from which a jury could conclude that Amtrak exhibited deliberate indifference through its failure to train, discipline, or control Drury regarding his use of force during an arrest.[47]  Based on the evidence, a reasonable jury could conclude that

---

[46]As with the circumstances surrounding Greco's arrest, there is a disagreement regarding whether King was intoxicated at the time of his arrest.  The Incident Report that Drury created after the arrest states that he received a report that King was intoxicated and that he "noticed the very strong odor of a alcoholic beverage emanating from subject."  (Doc. No. 27 Ex. F.)  Drury also concluded that King's speech was slurred.  (*Id.*)  However, King testified that he does not drink alcohol and that he was not intoxicated at the time of the incident.  (King Dep. at 18, 132.)

[47]Plaintiff also seeks to impose liability on Amtrak under § 1983 for its failure to train, discipline, or control Molloy.  Plaintiff offers insufficient evidence to support this theory.  There is no evidence that any citizen filed a complaint against Molloy alleging that he used excessive force while effecting an arrest.  Plaintiff relies on a complaint that was filed after a citizen witnessed two Amtrak police officers, one of whom was Molloy, fighting at Pennsylvania Station in New York City.  (Doc. No. 27 Ex. C.)  A reasonable jury could not conclude, based solely on

41

Amtrak's treatment of Drury was likely to lead to a violation of the Fourth Amendment rights of citizens that he would arrest.  Drury has a documented history of using physical aggression while placing individual suspects under arrest, as reflected by both his training background and the prior complaints lodged against him.  A jury could conclude that Amtrak was aware of each of these prior incidents, and that its failure to properly train, discipline, or control Drury led to his use of excessive force against Greco on September 18, 2000.  Plaintiff may proceed with this theory of liability against Amtrak under 42 U.S.C. § 1983.

### B.    False Arrest and False Imprisonment[48]

Defendants argue that the false arrest and false imprisonment claims against Drury and Molloy should be dismissed.  (Doc. No. 24 at 14-16.)  Under New Jersey law, a plaintiff may prevail on a false arrest claim if he demonstrates that:  (1) he was arrested or detained against his will; and (2) there was no proper legal authority or legal justification for the arrest or detention.[49] *Ramirez v. United States*, 998 F. Supp. 425, 434 (D.N.J. 1999); *Mesgleski v. Oraboni*, 748 A.2d 1130, 1138 (N.J. Super. Ct. App. Div. 2000) (citing *Barletta v. Golden Nugget Hotel Casino*, 580

---

[47] this complaint, that Amtrak was deliberately indifferent to a propensity for violence on the part of Molloy when he effects an arrest.  *Beck*, 89 F.3d at 973-74.

[48] Plaintiff's First Amended Complaint contains separate counts for false arrest (Count II) and false imprisonment (Count III).  However, "New Jersey courts treat false arrest and false imprisonment as the same tort."  *Ramirez v. United States*, 998 F. Supp. 425, 434 (D.N.J. 1999) (citing *Price v. Phillips*, 218 A.2d 167 (N.J. Super. Ct. App. Div. 1966)).

[49] In a diversity case, a district court must determine which state's substantive law will govern.  To make this determination, we must apply the conflict of law rules of the forum state. *Kirschbaum v. WRGSB Assocs.*, 243 F.3d 145, 150 (3d Cir. 2001).  Pennsylvania's choice of law analysis incorporates elements of both the "government interest" and "significant relationship" tests.  *Id.* at 151.  We agree with the parties' assessment that New Jersey substantive law governs this case.

F. Supp. 614, 617 (D.N.J. 1984)).  A plaintiff need not show that an officer lacked probable

cause to arrest him or that the officer acted with malice or in bad faith in order to prevail on a

false arrest claim.  *Bak v. Township of Brick*, Civ. A. No. 91-3385, 1993 U.S. Dist. LEXIS 888,

at *5 (D.N.J. Jan. 20, 1993); *Mesgleski*, 748 A.2d at 1139.  However, the existence of probable

cause will defeat a plaintiff's claim.  *Bak*, 1993 U.S. Dist. LEXIS 888, at *6; *Mesgleski*, 748

A.2d at 1139.  Defendants argue that Drury and Molloy had the requisite probable cause to arrest

Plaintiff.  (Doc. No. 24 at 14-15.)  We have concluded that there are genuine issues of material

fact regarding whether Drury and Molloy had probable cause to arrest Greco.[50]  Accordingly, we

will deny the Motion for Summary Judgment as to false arrest and false imprisonment.

### C.    Malicious Prosecution

To establish malicious prosecution under New Jersey law, a plaintiff must show that the

defendant:  (1) instituted criminal proceedings; (2) without probable cause; (3) with legal malice;

and (4) that the proceedings terminated in favor of the plaintiff.  *Trabal v. Wells Fargo Armored

Serv. Corp.*, 269 F.3d 243, 248 (3d Cir. 2001) (citing *Lightning Lube v. Witco Corp.*, 4 F.3d

1153, 1197 (3d Cir. 1993)).  Defendants assert that Plaintiff cannot prevail on this claim against

Drury and Molloy because the police officers had probable cause to arrest Plaintiff and there is

no evidence that Defendants acted with legal malice.  (Doc. No. 24 at 21-22.)  Again, we have

concluded that there are genuine issues of material fact regarding whether Drury and Molloy had

probable cause to arrest Greco.  Accordingly, we will deny the Motion for Summary Judgment as

to malicious prosecution.

---

[50]The standards for establishing probable cause under federal and New Jersey law are
generally the same.  *Santiago*, 107 F. Supp. 2d at 561-62.

### D.        Assault and Battery

When effecting an arrest of an individual, "a police officer may use such force as is reasonably necessary under the circumstances."  *Mantz*, 239 F. Supp. 2d at 507 (citing *Hill v. Algor*, 85 F. Supp. 2d 391, 411 (D.N.J. 2000)).  If the officer uses excessive force to effect the arrest, he may be liable for assault and battery.  *Id.*; *Hill*, 85 F. Supp. 2d at 411.  Even though an officer lacks probable cause to effect an arrest, any subsequent touching does not automatically result in liability for assault and battery.  Several courts applying New Jersey law have denied summary judgment on assault and battery claims because there were disputed factual issues regarding an officer's use of force, even though it was also unclear whether the officer had probable cause to effect the arrest.  *See Mantz*, 239 F. Supp. 2d at 498, 507; *Hill*, 85 F. Supp. 2d at 411-12; *Garrera v. Engelen*, Civ. A. No. 88-1238, 1989 U.S. Dist. LEXIS 11980, at *7, *9-10 (D.N.J. Oct. 10, 1989).  While a lack of probable cause may be considered in determining whether an officer committed an assault and battery, *Garrera*, 1989 U.S. Dist. LEXIS 11980, at *9, the focus of the inquiry is on whether the officer's use of force was reasonable given the totality of the circumstances.  Because we have concluded that there are genuine issues of material fact regarding whether Drury and Molloy used excessive force in effecting Greco's arrest, we will allow this claim against them to proceed.

### E.        Civil Conspiracy

Under New Jersey law, there are four elements to the tort of civil conspiracy:  (1) a combination of at least two persons; (2) an agreement with a common design; (3) an unlawful purpose, or a lawful purpose to be achieved by unlawful means; and (4) special damages.  *Morganroth & Morganroth v. Norris, McLaughlin & Marcus, P.C.*, 331 F.3d 406, 414 (3d Cir.

44

2003) (citing *Naylor v. Harkins*, 99 A.2d 849, 855 (N.J. Super. Ct. Ch. Div. 1953), *modified on other grounds*, 109 A.2d 19 (N.J. Super. Ct. App. Div. 1954)); *see also Weil v. Express Container Corp.*, 824 A.2d 174, 183 (N.J. Super. Ct. App. Div. 2003)).  In order to prevail under this theory, a plaintiff must show more than mere agreement to perform an unlawful act. *Morganroth & Morganroth*, 331 F.3d at 414.  Rather, there must be an underlying tort that is committed pursuant to the agreement.  *Id.*; *see also Diaz v. Johnson Matthey, Inc.*, 869 F. Supp. 1155, 1168 (D.N.J. 1994) (explaining that "the gravamen of a civil conspiracy action is the underlying wrong and the resulting damage").  "While circumstantial evidence may be sufficient to prove an agreement, pure speculation is not."  *Diaz*, 869 F. Supp. at 1168 (granting summary judgment to defendant on civil conspiracy claim).

Defendants argue that Plaintiff points to no evidence to show the existence of an agreement to commit false arrest, false imprisonment, malicious prosecution, or assault and battery against Greco.[51]  (*See* Doc. No. 24 at 22.)  We agree.  There is no direct evidence of such an agreement, nor could a jury infer from the circumstances that these Defendants "'had a meeting of the minds and thus reached an understanding to achieve the conspiracy's objectives.'" *Nicholas v. Saul Stone & Co.*, Civ. No. 97-860 (AET), 1998 U.S. Dist. LEXIS 22977, at *75 (E.D. Pa. June 30, 1998) (quoting *Adickes v. S.H. Kress*, 398 U.S. 144, 158 (1970)), *aff'd*, 224 F.3d 179 (3d Cir. 2000); *see also Union Trust Co. of Md. v. Wakefern Food Corp.*, Civ. No. 86-728, 1988 U.S. Dist. LEXIS 11858, at *10 (D.N.J. Oct. 5, 1988) ("Mere speculation that certain facts might exist is not sufficient to create a genuine issue of fact.") (granting summary judgment

---

[51]Plaintiff's response to Defendants' argument focuses solely on whether there was a civil conspiracy to maliciously prosecute Greco.  (Doc. No. 26 at 46-48.)

on civil conspiracy claim).  Furthermore, the record reflects that Baldwin never asked Drury or

Molloy to remove Greco from the train.  (Baldwin Dep. at 96.)  Rather, once he requested the

assistance of the Amtrak police, Drury and Molloy were responsible for deciding how to proceed.

(*Id.*)  In fact, Baldwin did not know why Drury and Molloy decided to remove Greco from the

train.  (*Id.* at 98-99.)  Because Plaintiff fails to offer sufficient evidence to establish the existence

of a civil conspiracy, we will dismiss this claim.

### F.     Breach of Contract

Defendant argues that summary judgment on Plaintiff's breach of contract claim is

appropriate because Greco failed to perform the duties that his contract with Amtrak imposed on

him.  A plaintiff may only prevail on a breach of contract claim if he proves:  (1) the existence of

a contract; (2) a breach of that contract; (3) resulting damages; and (4) that the party performed

its own contractual duties.  *Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 210 F. Supp.

2d 552, 561 (D.N.J. 2002), *aff'd*, 342 F.3d 191 (3d Cir. 2003), *cert. denied*, 540 U.S. 1178

(2004).  Under New Jersey law, "it is well settled that where one party to a contract is himself the

cause of a failure of performance by the other party, he cannot advantageously utilize his own

fault as an exit of escape from the performance of his contractual obligations."  *Rainier v.*

*Champion Container Co.*, 294 F.2d 96, 103 (3d Cir. 1961) (citing Restatement of Contracts §

295 (1931)).[52]  In responding to Plaintiff's Motion, Börger-Greco wholly ignores Defendants'

argument that the asserted contract breach was caused by Greco's conduct.  Instead, Plaintiff

---

[52]Section 295 was superseded by Section 245 of the Restatement (Second) of Contracts.
Section 245 provides that "[w]here a party's breach by non-performance contributes materially to
the non-occurrence of a condition of one of his duties, the non-occurrence is excused."
Restatement (Second) of Contracts § 245 (1981).

focuses on the evidence "that a contract existed between Greco and Amtrak, that Amtrak breached the contract, and that damages were sustained as a result of the breach." (Doc. No. 26 at 49.)  Plaintiff offers no evidence that Greco performed his own contractual duties. Accordingly, Plaintiff's breach of contract claim will be dismissed.

### G. Wrongful Death and Survival Actions

Claims under the New Jersey Wrongful Death Act, N.J. Stat. §§ 2A:31-1 to :31-6 (West 2005), and the New Jersey Survival Action Act, N.J. Stat. § 2A:15-3 (West 2005), arise from the death of an individual who would have had a cause of action against defendants.  However, the Acts "serve different purposes and are designed to provide a remedy to different parties."  *Smith v. Whitaker*, 734 A.2d 243, 248 (N.J. 1999).  A wrongful death action benefits the heirs of the decedent and is intended "to compensate survivors for the pecuniary losses they suffer because of the tortious conduct of others."  *Alexander v. Whitman*, 114 F.3d 1392, 1398 (3d Cir. 1997); *Vassiliu v. Prudential Prop. & Cas. Ins. Co.*, 839 A.2d 863, 868 (N.J. 2004).  The Survival Action Act supplements the Wrongful Death Act and provides a remedy to the estate of a person who sustained injuries resulting in death "by allowing the decedent's estate to recover any loss to the decedent that accrued between injury and death."  *Smith*, 734 A.2d at 249; *Vassiliu*, 839 A.2d at 868.  Thus, "plaintiff's survival and wrongful death actions are derivative of and dependent on the decedent's injuries."  *Vassiliu*, 839 A.2d at 868.  Because a jury may conclude that Defendants Drury and Molloy engaged in tortious conduct which caused Greco's death, we will permit Plaintiff's wrongful death and survival actions to proceed.

### H.     Loss of Consortium

A loss of consortium claim compensates an individual "for the loss of a spouse's 'society, companionship and services due to the fault of another.'" *Kibble v. Weeks Dredging & Constr. Co.*, 735 A.2d 1142, 1149 (N.J. 1999) (quoting *Wolfe v. State Farm Ins. Co.*, 540 A.2d 871, 873 (N.J. Super. Ct. App. Div. 1999)).  A plaintiff's right to recover for loss of consortium depends "'upon the existence of tortious conduct on the part of the defendant.'" *Reilly v. Prudential Prop. & Cas. Ins. Co.*, 653 F. Supp. 725, 735 (D.N.J. 1987) (quoting W. Keeton, *Prosser and Keaton on the Law of Torts* § 125 (5th ed. 1984)); *see also Horvath v. Rimtec Corp.*, 102 F. Supp. 2d 219, 236 (D.N.J. 2000).  Thus, there must be an underlying tort on which the loss of consortium claim may rest.  We are permitting Plaintiff to proceed with the false arrest, false imprisonment, malicious prosecution, and assault and battery tort claims.  Accordingly, we decline to dismiss Plaintiff's claim for loss of consortium.

An appropriate Order follows.

48

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ANA-BÖRGER GRECO                        :
   Administratrix of the Estate of    :
JOSE GRECO, Deceased                    :        CIVIL ACTION
                                     :
      v.                       :        NO. 02-CV-6862
                                     :
THE NATIONAL RAILROAD                   :
PASSENGER CORPORATION                   :
(AMTRAK), ET AL.                        :

## <u>ORDER</u>

AND NOW, this 1st day of June, 2005, upon consideration of Defendants The National

Railroad Passenger Corporation ("Amtrak"), Amtrak Police Officer Richard P. Drury ("Drury"),

Amtrak Police Officer Kevin Molloy ("Molloy"), and Amtrak Conductor Alex Baldwin's

("Baldwin") Motion For Summary Judgment (Doc. No. 24, No. 02-CV-6862), Defendants

Amtrak, Drury, Molloy, and Baldwin's Motion In Limine (Doc. No. 27, No. 02-CV-6862), and

Plaintiff Ana Börger-Greco's Motion In Limine To Preclude Evidence That Jose Greco Had

Consumed Alcohol, Smelled Of Alcohol And Possessed An Unopened Bottle Of Beer At The

Time Of His Arrest (Doc. No. 28, No. 02-CV-6862), and all papers submitted in support thereof

and in opposition thereto, it is ORDERED as follows:

1.      Defendants' Motion for Summary Judgment as to the excessive force claim

against Defendant Drury under 42 U.S.C. § 1983 is DENIED;

2.      Defendants' Motion for Summary Judgment as to the false arrest claim against

Defendant Drury under 42 U.S.C. § 1983 is DENIED;

3.      Defendants' Motion for Summary Judgment as to the excessive force claim

against Defendant Molloy under 42 U.S.C. § 1983 is DENIED;

4.     Defendants' Motion for Summary Judgment as to the false arrest claim against Defendant Molloy under 42 U.S.C. § 1983 is DENIED;

5.     Defendants' Motion for Summary Judgment as to the claim against Defendant Baldwin under 42 U.S.C. § 1983 is DENIED;

6.     Defendants' Motion for Summary Judgment as to the "failure to train regarding treatment of sick passengers" claim against Defendant Amtrak under 42 U.S.C. § 1983 is GRANTED;

7.     Defendants' Motion for Summary Judgment as to the "failure to train, discipline, or control Drury" claim against Defendant Amtrak under 42 U.S.C. § 1983 is DENIED;

8.     Defendants' Motion for Summary Judgment as to the "failure to train, discipline, or control Molloy" claim against Defendant Amtrak under 42 U.S.C. § 1983 is GRANTED;

9.     Defendants' Motion for Summary Judgment as to the false arrest and false imprisonment claim is DENIED;

10.    Defendants' Motion for Summary Judgment as to the malicious prosecution claim is DENIED;

11.    Defendants' Motion for Summary Judgment as to the assault and battery claim is DENIED;

12.    Defendants' Motion for Summary Judgment as to the civil conspiracy claim is GRANTED;

13.    Defendants' Motion for Summary Judgment as to the breach of contract claim is GRANTED;

14.    Defendants' Motion for Summary Judgment as to the wrongful death and survival action claims is DENIED;

15.    Defendants' Motion for Summary Judgment as to the loss of consortium claim is DENIED;

16.    Defendants' Motion In Limine is GRANTED in part and DENIED in part, see attached Memorandum; and

17.    Plaintiff's Motion In Limine To Preclude Evidence That Jose Greco Had Consumed Alcohol, Smelled Of Alcohol And Possessed An Unopened Bottle Of Beer At The Time Of His Arrest is DENIED.

IT IS SO ORDERED.

BY THE COURT:

S:/R. Barclay Surrick, Judge